Good morning, Your Honors. May it please the Court, my name is Kurt Miller and I'm representing the petitioner. Under this case, we feel that the cell is prevailing law on this matter because of the fact that Mr. Wijaja belongs to a disfavored group. He's Chinese ethnicity of Indonesian and he's also a Christian and that he belongs to the Catholic religion when he was born. So therefore, we feel that there's a lower standard of individualized risk that he had to approve in order to show the persecution to be able to get asylum. The petitioner, Adi Perwano Wijaya, is an Indonesian citizen. His ethnicity is Chinese and he's a Christian. He claims the protective grounds of ethnicity, religion, imputed political opinion, and membership in a particular social group in that ethnic Chinese are at greater risk of persecution than the general population of Indonesia. As we see it, the overriding issue in this case is whether the substantial evidence compels the conclusion that no reasonable adjudicator would have denied asylum on this record. We believe the record compels the conclusion that the IJ erred in denying asylum and that the BI erred dismissing the petitioner's appeal. The things I'd like to emphasize are several points. Under the substantial evidence, the petitioner showed past persecution based on acts of discrimination, harassment, threats of violence, and physical violence. First, he saw a pamphlet in 1999 which was published by Muslims in Indonesia that Christians were to leave Indonesia or that they would be killed. Second, in 2000, a church which he had attended in Jakarta was bombed and that caused him great distress. Third, he stated that a church in Surabaya was bombed and because of that bombing, he stopped going to his church. Fourth, he testified about a demonstration which he intended in his school, which was during the time of the riots that occurred in 1998. And during that protest, the military and the police came and started shooting some of the demonstrators. He fled and was able to see that the police started not only killed people but wounded people and also caused great violence to people by beating them up. Fifth, he was personally assaulted when he went to a grocery store. And upon returning in the grocery store, a truck with Muslim people in the truck jumped out and yelled, Chinese, Chinese, and started beating him. In fact, he was kicked in his leg. And during the testimony, he told the IJ that he could prove the beating to the leg because the leg was still defective and he could squat down and show that it causes a noise when he comes back up. Six, he testified that in 1998, his uncle and aunt's house was destroyed because they're of Chinese ethnicity. And seven, he testified that also relatives that were of Chinese ethnicity had their house burned. And the last thing that he submitted was he had an expert. And the expert testified at great length about his professional opinion that Mr. Wajawa was a disfavored group from Indonesia. There was a pattern practice in Indonesia of persecuting people of Chinese ethnicity as well as persons of the Christian religion. As a result of the testimony, we feel that the burden of proof should have shifted to the government to prove that country conditions have so fundamentally changed that there would no longer be a well-founded fear of persecution. On this record, that didn't happen. In fact, they submitted the country reports which stated the arguments of the disfavored group and the persecution that goes on on these ethnic Chinese and these Christians. It also specifically stated in that report that there's continued abuses by the government for the ethnic Chinese as well as Christians. As noted, the petitioner's past experiences included the pamphlet which stated that Christians should leave Chinese or that they would be killed. The attack on him during the demonstration and the attack on him by the 20 or so Muslims that he testified. Didn't the IJ express credibility finding with regard to the demonstration and the assault? He did, Your Honor, but the petitioner stated that he suffered from depression and paranoia and caused him sometimes to be disoriented between testimony. The IJ didn't have to believe that, did he? No. Okay, so I believe that the expert testified that if everything your client said was true, that he had met his burden and then some, but the IJ said that he didn't believe that everything your client said was true and he didn't accept your client's explanation and, in fact, found the explanation particularly lacking in credibility. So what are we supposed to do with that, given those express findings? Well, I think that the IJ was biased in his decision and felt that there wasn't this persecution that went on with Christians and people of the Chinese ethnicity from Indonesia. What evidence is there of that bias in the record? Well, the fact that he found that it was a frivolous application which was overturned by the BIA. And also he stated specifically as the expert's testimony that he didn't believe anything that the expert said and actually stated that according to this expert, this person would automatically be entitled to asylum because he had shown that he's from the Chinese ethnicity and also from the Christian religion and the expert had discussed his personal situation and he felt that he didn't meet his burden. Well, didn't the expert, in fact, say that all of the Chinese Christians in Indonesia, in his opinion, would be entitled to asylum? He actually did, Your Honor. So that wasn't the IJ who said that. That was the expert who said that. That was the expert. He specifically talked about the bombings that occurred in 2000 and the bombings that occurred from that time forward and stated that Christians are at risk. And specifically stated that he is from its favorite group. That's the point. And so it was determined later to this case. And that's what the expert was trying to bring forward. Assuming argumenta that he didn't prove past persecution, we feel that his experiences established a well-founded fear of future persecution because of the three things that happened to him personally. The country conditions report that's submitted, even if the court doesn't find past persecution, the country conditions should be weighed to satisfy the objective component to establish a well-founded fear of future persecution, in that the country courts submitted show a well-founded fear of persecution because he's of ethnic Chinese. His religion is Catholic, which is Christianity, which they're trying to rid. The report states so. And the political opinion is shown because the perception of many native Indonesians is that he is the enemy, primarily because of his ethnicity as Chinese, but also because of his religious beliefs, which is contrary to the Muslim religion. Well, let me ask you something. You heard my discussion with counsel about what does the sales standard mean and what's the low level of individualized risk that we're talking about. Let's take the bus incident. Suppose that the Muslims were driving around the truck and they were looking for any Chinese to beat up or throw stones at. Would he have the requisite level of individualized risk? I believe so, Your Honor, because of the fact that, as you stated, what if they said that, you know, specific comments about him, specific racial slurs. In this case, the testimony was that they did. They said Chinese, Chinese. Chinese, correct. Okay. So in your view, a general statement that that's a Chinese and we're going to go get him makes the persecution individualized. Even if they just stumbled upon him? Right. It would be different. Any Chinese. Not really after your client. They're after any Chinese. Right. Which makes him in that member, right, he's a member of that social group of Chinese. These people were Muslims. And his testimony was they were wearing Muslim hats. They screamed Chinese, Chinese, jumped out of the van and started kicking him, stole his groceries and actually hurt him, knocked him off his motorcycle. He still suffers from that today. The individualized risk to him would be the same thing that would happen if he was returned to Indonesia, which is what he stated. He stated that he feared persecution. All right. Thank you, counsel. I guess I don't have to go very far. Good morning again, Your Honors. As counsel has stated, there were at least, according to the record of evidence, there were approximately five incidents that petitioner testified that were, that he testified were incidents of persecution, the first being the pamphlet that he saw. And that is an incident of persecution which did not, you know, involve any harm to the petitioner. The second was the church bombings in Jakarta. Depending on what point in the testimony you are referring to, it was the cathedral in Jakarta that was bombed or it was his own church in Surabaya that was bombed or it was another church in Surabaya that was bombed that gave him pause to go to his church in Surabaya any longer because he was afraid that would be the next one to be bombed. Even regardless of which of those scenarios you look at, he was not harmed during any one of those incidents either. Then there was the police crackdown on the student demonstration in 1998 at the university where he attended. Again, this is an incident in which no harm came to the individual, I mean to the petitioner himself. The fourth incident of persecution was the assault, or the alleged assault I should say, in January of 2001 which coincided with the Muslim New Year. And the fifth was his family's involvement, not his immediate family, but his aunt and uncle's involvement with the riots of 1998 and what happened to their property as a result thereof. In four out of the five situations, no harm came to the petitioner himself. Now what the immigration judge made two distinct findings in this case. The first was that he did not believe the testimony of the petitioner. So he made an adverse credibility finding. He based that adverse credibility finding on numerous inconsistencies and implausibilities in the testimony of the petitioner. Starting with, as I alluded to earlier, the cathedral bombings. Initially, there was a counterplay between the individual's declaration in support of his asylum application and his actual testimony in court. And in that, he changed his story on a couple of occasions as to what bombings it was that caused him to fear returning to church any longer and interrupting his faith. In the student demonstrations, he had two varying stories in his application as opposed to his in court testimony. And with regard to the January 2001 attack that occurred in conjunction with the New Year's celebration, there are some pretty glaring inconsistencies. And that was the one incident where the petitioner was actually harmed, if you believe the petitioner, although the immigration judge did not. It was the only one in which he testified that he was actually harmed. And there are several inconsistencies with that testimony regarding how that occurred. In his declaration, he doesn't talk about a motorbike, the fact that he was traveling to and from the supermarket on a motorbike. He does testify to that in his actual hearing testimony. He also testifies or states in his declaration that the attack occurred as he was leaving the supermarket. In his testimony, he was on his way home, almost all the way home, had ridden several kilometers to get to his house, and was now in his own ethnic Chinese neighborhood about a quarter of a kilometer away. So those are two changes in the testimony. In addition, he testified in court that he was kicked in the leg so hard that he couldn't walk for ten minutes. But eventually he was able to get up, get on his motorbike, and continue home. In his declaration, he not only was kicked in the leg and injured, but he was also hit with a stick which injured his head, gave an injury to his head. However, there was no scar. He then testifies with regard to his in-court testimony with regard to the damage to his knee and the long-term effects of that. There's never been any testimony or evidence, intrinsic testimony, there's never been any evidence presented as to the extent of the injury to his knee, or that he ever received any kind of, there was testimony that he went to an honorable practitioner but was unable to or unable to afford to go to an orthopedic surgeon or an orthopedic doctor, either in Indonesia or in the United States. So there is no evidence as to the extent of the injury to the individual. And because the immigration judge made the adverse credibility finding, we can't believe what it is that he said. With regard to the incident involving his aunt and uncle, that was in his affidavit, or in his declaration in support of his asylum application. He didn't testify to that at the hearing itself. And that was during a time of the general unrest in Indonesia during the May 1998 riots. In his opposition that the IJ was justifiably concerned that the individual, that the petitioner could not give him a consistent, detailed account of what happened during the one incident in which he was harmed and in which he bases pretty much his whole asylum claim on. The other incidents don't rise to the level of persecution because there was no harm to the individual. And with regards to the adverse credibility determination, that's the immigration judge. It's an old habit. The immigration judge. Yesterday they were being called the prosecutors, so it's okay. I feel better. Thank you. The adverse credibility finding determination rests on the fact that he could not give a clear, detailed, consistent account and, therefore, substantial evidence supports the IJ's finding of adverse credibility. And also he made the second finding that the immigration judge found was that even if you believed the petitioner, that the one incident where he was actually harmed did not rise to the level of persecution. And I think that's where Yorana's question comes in about the individualized risk, patent and practice evidence and things of that nature. I don't know that it has been quantified yet just how much an individual has to be harmed before they can, before they reach that level. What I do know is that the cases state that there is a lower individualized risk, but in this particular case the individual, the harm, and there is case law that says the persecution is an extreme form or an extreme incident, and this does not rise to the level of an extreme incident. Okay. So in this particular case, just looking at the bus incident, or not the bus, the 20 Muslims in the truck incident, and disregarding for a second the adverse credibility determination, accepting that it's true, if they had, instead of just hitting him on the legs, they had tortured him instead, would you agree that that was persecution? If they tortured him, would I agree it was persecution? I guess if it was on, I would have to say yes if it was on account of one of the enumerated bases in the INA, but that wasn't clearly established either. Right. So let's just assume the story is true that they yelled Chinese, Chinese, attacked him and tortured him. Would that be enough to show individualized risk? Well, I don't think that necessarily calling him by an ethnic term would put him in the category of having been persecuted on account of his ethnicity. I think that you have to look at the motive of the individuals as they attacked him. What did they do to him and what was their goal in attacking him? And in this case, it seems pretty clear that what they wanted was his food and his money, because once they pulled him over, that's what they took, and then they left him. So it doesn't necessarily, it's not necessarily clear, and we would argue that it was not on account necessarily of his race, of his ethnicity, that he was attacked, but because he had something that they wanted. Or it goes back to in our previous discussion that there is an understanding or a feeling that ethnic Chinese are better off than ethnic Indonesians, and therefore any Chinese person is going to have money. Well, he had a motorbike and he obviously had food, which maybe led them to believe that he had more, and that was why they attacked him. But it seems to be a criminal act more than it is a persecutive act. Thank you. Thank you, Your Honor. All right. Thank you, counsel. Wujea v. McKayse will be submitted. Ola Bhanji has been submitted on the briefs. Wyatt Technology v. Smithson has been removed from the calendar. And we'll hear from counsel in Richards v. Richards.
judges: Wardlaw, Ikuta, Fogel